UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| LULA M. WILLIAMSON, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 05 C 3973 |
| MICHAEL ASTRUE,[1] COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) | Judge Nan R. Nolan |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lula M. Williamson claims that she is disabled due to hypertension; sleep apnea; mild asthma; history of coronary artery disease; and depression. She filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have filed cross-motions for summary judgment. For the reasons set forth here, the Commissioner's motion is granted and Williamson's motion is denied.

## PROCEDURAL HISTORY

Williamson applied for DIB on October 31, 2002, claiming that she became disabled on March 26, 2002, around the time she was admitted to the hospital for coronary artery bypass surgery. Williamson also claimed that she was limited by asthma, hypertension, ulcers, arthritis, depression, and anemia. (R. 70-72, 117.) The application was denied initially on April 8, 2003, and again on reconsideration on June 26, 2003. (R. 40, 46.) Williamson appealed the decision and

---

[1] On February 12, 2007, Michael Astrue became Commissioner of Social Security, replacing Acting Commissioner Linda S. McMahon (January 20 to February 11, 2007), and Commissioner Jo Anne B. Barnhart. Astrue is substituted for his predecessor pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

requested an administrative hearing, which was held on February 15, 2005. (R. 364.) On March 17, 2005, the Administrative Law Judge ("ALJ") denied Williamson's claim for benefits, finding that she is capable of performing her past relevant work as a shoe sales representative, as well as a significant number of other unskilled jobs in the economy. (R. 26-33.) The ALJ found that Williamson's allegations of debilitating depression were not credible, and that the objective medical evidence did not support her claim that she needs to avoid all stress and cannot lift more than ten pounds. (R. 30-31.) Williamson now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

## FACTUAL BACKGROUND

Williamson was born on December 23, 1946 and was 58 years old at the time of the hearing before the ALJ. (R. 70.) She has a tenth grade education and lives with her husband and adult son in a house in Chicago, Illinois. (R. 371-72.) Williamson's work history shows earnings between 1964 and 2002, with the exception of a few years during which she raised her children. (R. 76.) Her most recent past relevant jobs include supervisor for a candy kitchen (March 1992 to May 1997); shoe sales representative (1995 to 1997); and customer service representative (March 1999 to March 2002). (R. 108.)

**A.     Medical History**

Between June 12, 1997 and March 15, 2000, Williamson was seen 15 times at Accord Behavioral Health Services for an "adjustment disorder." (R. 300-01.) The notes regarding these visits are largely illegible, but it appears that Williamson ultimately found an elder at her church to be more helpful "because of use of the Bible." (R. 301.) On November 18, 2000, Williamson started receiving treatment at the West Suburban Hospital Family Practice Center for a variety of conditions, including fatigue, asthma, hypertension, and hip pain. (R. 161-73.) On May 17, 2001, doctors noted that Williamson exhibited a decrease in her energy levels, interest, and concentration, and showed signs of depression and psychomotor slowing. (R. 172.) By December

2001, Williamson was still complaining of fatigue and difficulty sleeping, and on January 12, 2002, she underwent a sleep study. Williamson was diagnosed with "obstructive sleep apnea syndrome, severe, chronic with difficulty maintaining sleep," and was instructed to start using a CPAP ("Continuous Positive Airway Pressure") machine to assist her breathing. (R. 29, 173, 315.)

On January 15, 2002, Williamson was examined by cardiologist William Millman, M.D. Williamson reported that she was experiencing increasing shortness of breath with modest activity and "increasing tiredness." (R. 298.) Dr. Millman noted that Williamson "appears to be very depressed and attributes this to a lot of incidental stress at work and at home." (*Id.*) Dr. Millman also opined that he "would be very suspicious that she has a significant level of depression." (R. 298-99.)

On March 26, 2002, Williamson reported to Holy Family Medical Center complaining of chest pain and was diagnosed with high blood pressure, asthma, sleep apnea, obesity, and history of stomach ulcer. (R. 258-59.) A cardiac catheterization conducted on March 27, 2002 showed that Williamson had suffered a heart attack and had severe vessel disease. (R. 274.) She was transferred to West Suburban Hospital where she had a triple coronary artery bypass grafting on March 28, 2002. (R. 225-27.) It is not clear when Williamson was discharged from the hospital, but she was readmitted to West Suburban between April 3 and 9, 2002 due to lightheadedness, decreased energy, and lower extremity edema (swelling). (R. 211-15.) She returned to the West Suburban Hospital emergency room on April 29, 2002 due to vomiting, and on June 16, 2002 due to left arm pain, but it does not appear that either visit required a hospital admission. (R. 198, 206.)

Dr. Millman examined Williamson on November 22, 2002 and reported that she had completed Phase Two of her cardiac rehabilitation and would continue to exercise regularly as a Phase Three patient. (R. 332.) Shortly thereafter on December 16, 2002, treating physician Dr. Melanie Jessen reported that, based on her most recent October 21, 2002 examination, Williamson still had chest discomfort precipitated by walking, emotional stress, climbing, lifting, carrying, and

3

cold air, and she experienced fatigue and shortness of breath on ordinary activity. (R. 309-10.) At the time, Williamson was still in Phase Three of her cardiac rehabilitation, and could lift no more than ten pounds, make her bed, and cook. Dr. Jessen gave Williamson a New York Heart Association class rating of I-II, meaning she had between no limitation and a slight limitation of physical activity. (R. 310-11.) Under a Class I rating, ordinary physical activity does not cause undue fatigue, palpitation, or shortness of breath. Under a Class II rating, an individual is comfortable at rest but ordinary physical activity results in fatigue, palpitation, or shortness of breath. (*See* http://www.abouthf.org/questions_stages.htm.)

On January 17, 2003, John F. Conran, M.D. performed a consultative psychiatric evaluation of Williamson. Williamson reported having trouble sleeping and said that she was afraid of being outside her home. Williamson also told Dr. Conran that she has a history of feeling very fatigued, and that her husband helps considerably with the housework. (R. 336-37.) Williamson described herself as being "considerabl[y] stress[ed]," and Dr. Conran noted that she was "somewhat reclusive," and "somewhat withdrawn socially." (R. 339.) Dr. Conran found Williamson to be cooperative and appropriate during the interview, and his notes indicate that she is capable of abstract thinking, performing calculations, making judgments and insights, and managing her own funds. (R. 338.) The doctor did observe slowed body and psychomotor activity, and noted that Williamson's "mood was sad," but he also stated that she was "appropriately concerned" about her health. (R. 337-39.) Dr. Conran diagnosed Williamson with major depression, recurrent, and a history of cardiac bypass surgery. (R. 339.)

Tyrone C. Hollerauer, Psy.D. never examined Williamson, but on February 13, 2003, he completed a functional capacity assessment based on his review of Dr. Conran's records. (R. 158.) Dr. Hollerauer opined that Williamson suffered from depression, secondary to a "gen med cond," and that she was moderately limited in her ability to perform activities of daily living, and in her ability to maintain social functioning, concentration, persistence, and pace. (R. 142-55.) Dr.

Hollerauer also stated that Williamson was moderately limited in her ability to maintain attention and concentration for extended periods, and in her ability to maintain regular attendance and be punctual. (R. 156.) In his written summary of Williamson's functional capacity, Dr. Hollerauer noted that Williamson's memory and cognition are intact, that she does not receive counseling for depression, and that she is "able to concentrate and maintain pace normally required to perform [substantial gainful activity]." (R. 158.) He opined, however, that Williamson's fear over having another heart attack "limits her ability to do task[s] that would be too psychologically stressful and she is thus limited to simple unskilled tasks." (*Id.*)

On March 19 and June 2, 2003, Dr. Millman completed Cardiac Reports based on his most recent examination of Williamson on February 18, 2003. Dr. Millman found that Williamson had no congenital heart disease; no neurological complications; no evidence of arrhythmia; no end organ damage as a result of hypertension; no symptoms of inadequate cardiac output; and no cardiac symptoms on ordinary activity. (R. 294-96, 303-04.) He concluded that Williamson had no restrictions on her ability to engage in physical activity or ordinary activities of daily living, and noted that she had completed cardiac rehabilitation and was "clinically stable." Dr. Millman gave Williamson a New York Heart Association class rating of II. (R. 296, 304-05.)

George Andrews, M.D. completed a Physical Residual Functional Capacity Assessment of Williamson on April 2, 2003. (R. 134-41.) Dr. Andrews opined that Williamson could occasionally lift 50 pounds; frequently lift 25 pounds; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and push and pull without limitation. (R. 135.) He found no other limitations except a need to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (R. 138.) Based on these assessments, Dr. Andrews stated that Williamson was able to perform medium work. (R. 141.)

The only other medical records indicate that between November 20, 2003 and June 7, 2004, Williamson was treated at John H. Stroger, Jr. Hospital. The records are largely illegible, but

Williamson states that she was treated for coronary artery disease, hypertension, congestive heart failure, and stable angina. (R. 354-63; Pl. Mem., at 5.) In addition, on some unspecified date, a Social Security Administration interviewer met with Williamson and completed a Disability Report - Field Office. (R. 126-30.) The interviewer indicated that Williamson had a "depressed mood." (R. 129.)

**B.     Williamson's Testimony**

At the February 15, 2005 hearing, Williamson's attorney identified three major impairments at issue: severe sleep apnea, status post-triple bypass surgery, and major depression. (R. 367.) Williamson testified that she stays in bed almost all day and feels like she does not "have anything else . . . to do or to make [her] get out of bed." (R. 378-79.) In response to the ALJ's question whether a job might make her feel better about herself, Williamson stated that she did not know. (R. 379.) Williamson testified that she is afraid of leaving home, but she also admitted that she drives to the Kingdom Hall of Jehovah's Witness in Steger, Illinois once a week, and occasionally accompanies her husband to the store. (R. 371-72, 382.) She and her husband also go to her daughter's house, and sometimes friends or family members come visit her. (R. 382-83.) Williamson stated that she attends religious services at least once or twice a week and socializes with congregants at Bible study. (R. 383.) She both cooks at home and eats out on occasion, and she washes dishes and makes her own bed. (R. 381, 383.) When at home, Williamson reads and watches television, but does not clean or do laundry. (R. 381, 384.)

Williamson testified that she can only walk for one to two blocks at a time because sometimes it is too cold or too hot, and sometimes she gets tired. (R. 380.) She did not know how long she can stand at one time, but stated that she had veins taken from her legs and sometimes needs to raise them when they swell and ache. (R. 380-81, 385.) Williamson stated that she has difficulty falling and staying asleep, and reported feelings of worthlessness and difficulty concentrating. She claimed that her doctor told her not to go for treatment for her anxiety and

6

depression "because they would just give me more medication." (R. 377, 386.) Williamson was taking fluoxetine at the time and stated that it "seemed to help me a little." (R. 378.) She also admitted that she still has interest in engaging in activities and going places. (R. 387.)

With respect to her past work, Williamson stated that she cannot work as a customer service representative because it is too stressful, and Dr. Jessen recommended against that type of work. (R. 372.) She also claimed that Dr. Jessen told her not to lift more than ten pounds. (R. 373-74.) Williamson admitted that she only needs to use her asthma inhaler once every three months or so, and that she only uses her CPAP machine three times per week, though it does not help her sleep. (R. 375-76.) Williamson takes aspirin for her arthritis, and is most bothered by stress. (R. 376, 379.)

### C.  Vocational Expert Testimony

Frank Mendrick testified at the hearing as a Vocational Expert ("VE"), and began by assessing the nature of Williamson's previous work. He characterized her customer service job as sedentary and semi-skilled, and described her work as a supervisor in a candy-packing department as skilled and light. He noted, however, that the supervisor position required medium exertion as performed by Williamson. The VE testified that Williamson's work as a shoe sales representative was also medium and semi-skilled because it was not unusual for the sales people to climb and carry stock. (R. 392.)

The ALJ asked the VE whether an individual with Williamson's work experience, age (58), and education (tenth grade) could perform any past relevant work with the following restrictions: (1) sitting for six to eight hours per day; (2) standing and walking at least six hours per day; (3) frequently lifting and carrying up to 25 pounds, and occasionally lifting and carrying up to 50 pounds; (4) avoiding concentrated exposure to dust, odors, fumes, and gases; and (5) avoiding jobs with more than low to moderate levels of stress. (*Id.*) The VE testified that such an individual would be capable of performing Williamson's past work as a shoe sales representative. (R. 393.) If the

individual were limited to light work, she could perform the shoe sales job in a larger store where she did not have to do stock work. (*Id.*) According to the VE, there are also 5,000 unskilled general assembly jobs available to an individual with Williamson's background, limitation to medium work, and need to avoid high levels of stress. There are also 1,500 medium level general inspection jobs, and 5,000 packaging positions. (*Id.*) If an individual needed to take unscheduled breaks "beyond what is permitted by general employment practices," or if she had a ten-pound lifting restriction, however, she could not perform any of these jobs. (394-95.)

**D.	The ALJ's Findings**

The ALJ found that Williamson suffered from a history of coronary artery disease, hypertension, sleep apnea, mild asthma, and depression, but that she was capable of performing her past relevant work as a shoe sales representative, as well as a variety of other jobs in the national economy. (R. 32.) In reaching this conclusion, the ALJ found that Williamson had fully recovered from her bypass surgery after completing rehabilitation, and that she had no restrictions on her physical activities as of March 2003. (R. 29.) The ALJ noted the January 17, 2003 psychiatric consultative examination stating that Williamson was sad and stressed, and observed that based on that examination, Dr. Hollerauer had opined that Williamson was limited to simple, unskilled work. (R. 30.) The ALJ found no basis for such a limitation, however, explaining that Williamson "did not display any evidence of limitations in her ability to maintain attention and concentration during that evaluation [with Dr. Conran] nor did she display evidence of such limitations during her hearing before the undersigned." (*Id.*) The ALJ observed that Williamson visits with her daughter and socializes with people at Kingdom Hall, and stated that there was no evidence that Williamson was taking any psychotropic medications. (*Id.*)

With respect to Williamson's testimony, the ALJ did not find it "in the least bit persuasive." (*Id.*) The ALJ did not find it credible that Williamson's doctor had refused to refer her to a mental health specialist because "they would just give her more pills." (*Id.*) Nor was the ALJ convinced

8

that Williamson's doctors had instructed her to avoid all stress and to not lift more than ten pounds. As the ALJ noted, the only opinion of record with such a lifting restriction was dated more than two years earlier, before Williamson had completed her cardiac rehabilitation. (R. 30-31.) The ALJ concluded that Williamson had the residual functional capacity to lift and carry 25 pounds frequently and 50 pounds occasionally; sit for six hours in an eight-hour workday; stand and/or walk for six hours in an eight-hour workday; tolerate no more than moderate (less than concentrated) exposure to pulmonary irritants; and deal with low to moderate (less than high) levels of stress. (R. 32.) Thus, she could perform her past work as a shoe sales representative and was not disabled.

## **DISCUSSION**

**A.     Standard of Review**

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act.  *See* 42 U.S.C. § 405(g).  In reviewing this decision, the court may not engage in its own analysis of whether Williamson is severely impaired as defined by the Social Security Regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted).  Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner."  *Id.* (citation omitted).  The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)).  Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion."  *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision."  *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted).  The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion."  *Young,* 362 F.3d at 1002.  Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated

as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

**B.     Five-Step Inquiry**

To recover DIB under Title II of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). In addition, the claimant must show that she had disability insured status at the time she became disabled. 20 C.F.R. § 404.131; *West v. Apfel*, No. 99 C 6235, 2000 WL 1847766, at *1 (N.D. Ill. Dec. 14, 2000).

**C.     Analysis**

Williamson argues that the ALJ erred in concluding that her claims of debilitating depression were not credible, and in relying on the testimony of the VE to find her capable of performing medium level work. The court disagrees.

**1.     Williamson's Credibility**

In assessing a claimant's credibility when the allegedly disabling symptoms (such as pain or fatigue) are not objectively verifiable, an ALJ must first determine whether those symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th

10

Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Id.* (quoting *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004)). *See also* 20 C.F.R. § 404.1529. The ALJ must provide specific reasons for the credibility finding, but hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

As a preliminary matter, Williamson makes much of the fact that the ALJ did not cite SSR 96-7p in her decision or set forth the specific requirements for assessing credibility. (Pl. Mem., at 10-11; Pl. Reply, at 1-2.) Regardless, the ALJ clearly considered all relevant evidence in the record, including Williamson's entire medical history and her testimony at the hearing. An ALJ "need not discuss every piece of evidence in the record" as long as she does not ignore "an entire line of evidence that is contrary to the ruling." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). As discussed below, the ALJ built an accurate and logical bridge from the evidence to her conclusion. *Young,* 362 F.3d at 1002.

The objective medical evidence in this case does not support Williamson's complaints of disabling depression. Williamson was seen 15 times over a period of approximately three years between June 1997 and March 2000 for an "adjustment disorder," but she never received any further psychological treatment or counseling. (R. 300-01.) Williamson's treating physician observed that in May 2001, she suffered from fatigue, decreased energy, impaired interest, decreased concentration, psychomotor slowing, and depression. (R. 172.) Williamson's cardiologist similarly noted in January 2002 that she appeared to be depressed. (R. 298-99.) Shortly thereafter in March 2002, Williamson suffered a heart attack. After that date, none of

11

Williamson's treating physicians expressed concern about depression, or recommended that she receive counseling.

Williamson stresses that on January 17, 2003, consultative psychiatrist John Conran diagnosed her with "major depression, recurrent," and that on February 13, 2003, state agency consultant Tyrone Hollerauer relied on that diagnosis in concluding that she is moderately limited in her ability to concentrate, perform daily activities, and function socially. The ALJ, however, reasonably concluded that neither report supports a finding of disabling depression. Dr. Conran did note that Williamson was very stressed, somewhat withdrawn socially, and sad, and he observed slowed body and psychomotor activity. (R. 337-39.) At the same time, Dr. Conran found Williamson to be cooperative and appropriate during the interview, and his notes indicate that she is capable of abstract thinking, performing calculations, making judgments and insights, and managing her own funds. (R. 338.) Nowhere did Dr. Conran suggest that Williamson suffered from a significantly limiting mental health deficit. Dr. Hollerauer, similarly, stated in his written notes that Williamson's memory and cognition are intact, that she does not receive counseling for depression, and that she is "able to concentrate and maintain pace normally required to perform [substantial gainful activity]." (R. 158.) The ALJ fairly concluded that neither report supports a conclusion that Williamson's depression is disabling.

Williamson is correct that the ALJ erred in stating that she was not prescribed any psychotropic medications. In fact, Williamson was taking fluoxetine, which is used to treat depression. (*See* http://www.drugs.com/fluoxetine/html.) Nevertheless, a prescription for fluoxetine, in and of itself, is not sufficient to establish disabling depression absent any corroborating medical records, or any evidence that Williamson sought or received additional treatment or counseling for that condition. *See, e.g., Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) ("[R]epeated failure by [the claimant] to seek medical treatment [for her depression] provides support for the ALJ's . . . finding" that the claimant was not entirely credible). Williamson

testified that she asked for mental assistance at one time but that her doctor told her not to see anyone "because they would just give me more medication." (R. 377, 386.) The ALJ was not patently wrong in rejecting such testimony as "not in the least bit persuasive." (R. 30). *See also Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004) (an ALJ's credibility determinations are entitled to "special deference.") The ALJ also acted reasonably in rejecting Williamson's claim that her doctor told her to avoid all stress. Not one of Williamson's medical records prescribes such a limitation.

Williamson's additional testimony further supports the ALJ's conclusion that her complaints of disabling depression were not credible. Williamson testified that she has feelings of worthlessness, stays in bed almost all day, and feels like she does not "have anything else . . . to do or to make [her] get out of bed." (R. 378-79.) Williamson also stated that she is afraid of leaving home. At the same time, Williamson admitted that she drives to Kingdom Hall once a week; occasionally accompanies her husband to the store; goes to her daughter's house for visits; has friends and family visit her at the house; attends religious services at least once or twice a week; eats out on occasion; and socializes with congregants at Bible study. In addition, though Williamson complained of difficulty concentrating, none of her treating physicians observed such a problem; Williamson herself stated that she reads and watches television; and the ALJ personally saw no evidence of any concentration problems during the hearing. (R. 28.) In light of the evidence in the record, the ALJ was not "patently wrong" in determining that Williamson's complaints of disabling depression were not credible. *Powers*, 207 F.3d at 435. Williamson's motion for summary judgment on this basis is denied.

### 2. The RFC Determination

Williamson also objects that the ALJ erred in finding her capable of performing medium level work. Williamson notes that she is 58 years old and suffers from sleep apnea, hypertension, and coronary artery disease. (Pl. Mem., at 12.) She also finds it significant that her doctor gave her a

ten-pound lifting restriction, and that she received a New York Heart Association rating of Class II, meaning she experiences fatigue, palpitation, or shortness of breath with ordinary physical activity. (*Id.* at 13.) As the ALJ noted, the ten-pound lifting restriction is found in an October 21, 2002 examination, completed while Williamson was still undergoing cardiac rehabilitation following her bypass surgery. Williamson's cardiologist, Dr. Millman, did give her a Class II New York Heart Association rating, but by February 2003, he also found that she had no congenital heart disease; no neurological complications; no evidence of arrhythmia; no end organ damage as a result of hypertension; no symptoms of inadequate cardiac output; and no cardiac symptoms on ordinary activity. (R. 303-04.) Dr. Millman concluded that Williamson had no restrictions on her ability to engage in physical activity or ordinary activities of daily living, and noted that she was "clinically stable" after completing cardiac rehabilitation. (R. 304-05.)

Consistent with this report, Dr. Andrews opined that Williamson was capable of performing medium work, meaning she could occasionally lift 50 pounds; frequently lift 25 pounds; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and push and pull without limitation. (R. 135.) In reaching this conclusion, Dr. Andrews specifically noted Williamson's need to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (R. 138.) The ALJ thoroughly reviewed this medical evidence and was not patently wrong in rejecting Williamson's testimony that she could only walk for one to two blocks at a time and could not lift more than a gallon of milk.

The ALJ also did not ignore the fact that Williamson "suffers from addition[al] physical impairments, for example asthma, hypertension, hip pain, and severe sleep apnea." (Pl. Reply, at 2.) *See Golembiewski*, 322 F.3d at 918 (an ALJ must consider the combined effects of all of the claimant's impairments). The ALJ expressly noted these impairments, and agreed that they are "severe." (R. 27.) The ALJ also explained, however, that Williamson only needs to use an inhaler for asthma about once every three months, and the only medication she takes for arthritis, chest

14

pain, hip pain, ulcers, and leg swelling is aspirin or Tylenol, and a water pill. (R. 28, 30.) Williamson has apparently received some treatment for hypertension between November 20, 2003 and June 7, 2004, and she uses a CPAP machine for her sleep apnea three times per week. None of the medical records, however, suggests that these conditions are disabling, either alone or in combination. The ALJ's determination that Williamson is capable of performing medium level work is supported by substantial evidence. *Young*, 362 F.3d at 1001.

### 3. Reliance on the VE's Testimony

Williamson finally insists that the ALJ erred in relying on the VE's testimony to find her capable of performing past work as a shoe sales representative. According to Williamson, "the ALJ failed to ask the VE a hypothetical based on the assessment of the state agency physicians who provided opinions." (Pl. Mem., at 14.) As explained above, however, the ALJ reasonably rejected Dr. Hollerauer's opinion limiting Williamson to simple, unskilled work as inconsistent with the medical opinions offered by her treating cardiologist and examining psychiatrist. *Indoranto*, 374 F.3d at 474 ("[T]he hypothetical question [the ALJ] poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record.") Based on the restrictions set forth by Dr. Millman, Dr. Conran, and Dr. Andrews, and considering Williamson's need to avoid exposure to concentrated levels of fumes, odors, dusts, gases, and poor ventilation, as well as high levels of stress, the ALJ properly accepted the VE's testimony that Williamson is capable of performing her past relevant work as a shoe sales representative, and that she can also perform a significant number of general assembly, inspection, and hand-packaging jobs available in the Chicago area. (R. 31.)

## **CONCLUSION**

For the reasons stated above, the Commissioner's motion for summary judgment [Doc. 16] is granted, and Williamson's motion for summary judgment [Doc. 13] is denied. The Clerk is directed to enter judgment in favor of the defendant.

ENTER:

Dated: August 21, 2007

_____
NAN R. NOLAN
United States Magistrate Judge